**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|                                                    |   |                                      |
| -------------------------------------------------- | - | ------------------------------------ |
| ASHOOR AKHTEEBO,                                   | ) |                                      |
|                                                    | ) |                                      |
|                       Plaintiff,                   | ) | Case. No. 07-C-1093                  |
|            v.                                      | ) |                                      |
|                                                    | ) | Magistrate Judge                     |
| MICHAEL J. ASTRUE,                                 | ) | Arlander Keys                        |
| Commissioner of Social                             | ) |                                      |
| Security                                           | ) |                                      |
|                       Defendant.                   | ) |                                      |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Ashoor Akhteebo, moves this court for Summary Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security (the "Commissioner"), who denied his claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). 42 U.S. C. § 401 *et seq.* (West 2007). Defendant Commissioner has filed a Cross-Motion for Summary Judgment. For the reasons set forth below, the Court grants Plaintiff's Motion for Summary Judgment, denies the Commissioner's Cross-Motion for Summary Judgment, and remands the matter back to the Commissioner for further proceedings consistent with this Opinion.

## FACTS AND PROCEDURAL HISTORY

Ashoor Akhteebo applied for SSI and DIB on August 12, 2005, alleging a disability onset date of June 21, 2001[1]. Record at 68-74. The SSA denied Mr. Akhteebo's claim initially and again upon reconsideration. R at 43-47, 54-57. Mr. Akhteebo subsequently requested a hearing before an Administrative Law Judge ("ALJ"), who held the requested hearing on September 14, 2006. R. 328-56. ALJ Cynthia Bretthauer issued a decision on September 20, 2006, denying Plaintiff's claim for benefits, finding that Plaintiff could perform a significant number of jobs that existed in the economy, including employment as a food preparer, mail clerk, or traffic shipper/receiver. R. 41. ALJ Bretthauer's decision became the final agency decision when the Appeals Council denied Plaintiff's Request for Review, on January 25, 2007. See 20 C.F.R. § 416.1481.

Mr. Akhteebo filed this lawsuit on March 13, 2007, seeking review of the Agency's decision and an award of benefits. Compl. ¶ 1. The case was initially assigned to Judge Samuel Der-Yeghiayan, in the Northern District of Illinois. On March 26, 2007, the parties consented to proceed before a magistrate judge, and the matter was reassigned to this Court. Thereafter, both parties moved for summary judgment. Mr. Akhteebo asks the Court to reverse the ALJ's decision and award benefits, or, in the

---

[1] At his hearing before the ALJ, Plaintiff amended his alleged disability onset date to July 5, 2005.

alternative, remand the case for further proceedings. The
Commissioner has filed a cross-motion for summary judgment.

## TESTIMONY AT THE HEARING

### A. Testimony of Plaintiff

At the hearing, Plaintiff testified that he dropped out of
school in the tenth grade, because he was forced to work to
support his family. In October of 2001, Plaintiff was injured
when the bus[2] he was driving was hit by another vehicle. He
stated that he injured his back and shoulder, and suffers from
dizziness as a result of the accident[3].

Plaintiff testified that he initially visited the emergency
room for these injuries and had some post-accident treatment,
including surgery on his shoulder. Plaintiff explained that he
stopped seeking medical treatment for these injuries after his
insurance ran out and after his physician told him that his pain
was unlikely to improve regardless of treatment. Plaintiff
claimed that, in any event, he was unable to take advantage of
the free medical care offered at Cook County Hospital, because he

---

[2] Plaintiff stated that he worked as a bus driver for the
Keeshin Transportation bus company; Park Place Parking, where he
shuttled travelers from public parking to O'Hare Airport; and the
Embassy Suite's Hotel at O'Hare, where he shuttled guests from
the hotel to O'Hare. Tr at 334-36.

[3] Plaintiff received a $10,000 lump sum Worker's
Compensation payment in connection with the accident, and he has
not worked since that time. R at 332-333.

3

was unable to drive himself there[4] and otherwise lacked access to transportation to the Hospital. R at 336-37.

Although Plaintiff was not under the care of a physician during the next several years following his accident, Plaintiff did visit the emergency room on several occasions for a variety of ailments, including shingles, a cyst on his leg, a skin tag on his arm, and a left eye infection. R at 337. During those visits, Plaintiff never sought treatment for back or shoulder pain. Tr at 337. However, in 2003, Plaintiff visited the emergency room after being beaten up by Chicago Bears wide receiver David Terrell[5]. During that visit, Plaintiff purportedly complained of back and shoulder pain. Tr at 337.

In 2005, with the assistance of his attorney, Plaintiff began seeking medical treatment, but only after filing his application for SSI and DIB. Plaintiff stated that he recently began undergoing physical therapy for his back pain, and that he had off and on pain in his left shoulder. Tr at 343-44. In addition, Plaintiff began receiving psychiatric treatment at Turning Point Behavioral Health Care Center ("Turning Point"), due to nightmares stemming from incidents that occurred approximately 25 years earlier. Plaintiff explained that,

---

[4] Plaintiff admitted that he had a driver's license without restrictions, but claimed he only drove short distances and in emergency situations.

[5] Mr. Terrell mistakenly believed that Plaintiff (who was assisting a friend by temporarily working as a valet at a Chicago nightclub) had stolen his car.

4

although he had suffered from the nightmares for several years, he never previously sought psychiatric care, because he lacked medical insurance. When the ALJ noted that Plaintiff in fact had medical insurance during his years driving a bus for the Keeshin Travel Company, Plaintiff explained that he worked long hours and multiple shifts, which prevented him from visiting a doctor. R. 340-41. Turning Point prescribed him Zoloft, but Plaintiff testified that the medication did not help him. He testified that he had some thoughts of suicidal ideation before he began taking the anti-depressant medication. Tr. 345.

Plaintiff also testified that he had been in a car accident approximately one month before his hearing. He told the ALJ that he went to the "Emergency Hospital" and received a prescription for Vicodin for the pain. He complained that the medications cause him stomach upset, dizziness, and headaches.

With regard to his current capabilities, Plaintiff testified that he can walk about one-half block before needing to rest, because he gets painful swelling in his feet. R at 345. Plaintiff sometimes walks with a cane, and stated that he can stand for only five or ten minutes before getting weak. Plaintiff can sit for only 30 minutes before needing to get up and stretch. R at 346. He cannot lift more than five to ten pounds, and experiences numbness in his hands. R at 346.

5

Plaintiff lives in an apartment paid for by his mother and siblings. With regard to his daily activities, Plaintiff stated that his pain prevents him from assisting with household chores such as cooking, cleaning, washing dishes, doing the laundry, or going grocery shopping. He typically watches television, but he occasionally reads. R. at 347. Although he dresses and grooms himself, he has great difficulty doing so. R. at 348. Plaintiff's nightmares and low energy prevent him from leaving the house often; he rarely visits family or friends, but he occasionally attends church. R at 349. On particularly bad days, Plaintiff leaves bed only to use the restroom or get a drink. R at 352.

## B.  Testimony of Vocational Expert James Radke

The ALJ asked VE Radke about a hypothetical individual who could sit, stand, and walk for six hours in an eight hour day; lift 25 lbs frequently and 50 lbs occasionally; only occasionally reach above shoulder level with the left non-dominant upper extremity; occasionally stoop, crawl, crouch, and climb ramps or stairs, but never climb ladders; and only perform simple and routine jobs. R. At 353-54. The VE responded that such an individual could likely physically perform Plaintiff's past relevant work as a driver. However, VE Radke stated that, while Plaintiff's past work was routine, it was classified as semiskilled, so he didn't know if it thoroughly met the

6

definition of simple in that regard. VE Radke opined that other work was available to the hypothetical individual, including: food preparation worker, receptionist, private guard, groundskeeper, and couriers. R. at 354. However, if this individual could not have regular contact with the general public, the receptionist, private guard, and courier positions would no longer be available. And if the hypothetical individual were to miss work more than two days per month due to psychological problems, VE Radke stated that "they'd be employable for only a very short time. I think they'd run into serious difficulties quickly." R at 355.

**MEDICAL EVIDENCE**

In March of 2001, Mr. Akhteebo was rear-ended by an automobile while driving his employer's bus. Mr. Akhteebo began experiencing neck pain, left shoulder pain, and low back pain. Plaintiff reported that he was immediately taken to Lutheran General Hospital emergency room, where he was treated and x-rays were taken. R at 164; 178-79.

In April of 2001, Advocate Occupational Health-Elk Grove Center diagnosed neck, left shoulder, and low back strain, and recommended work restrictions that included no bending, kneeling, squatting, driving of company vehicles, or work above the shoulders; no taking narcotic medications while working; and

lifting no more than 10 pounds. R at 180. Dr. Odisho supervised Plaintiff's rehabilitation. R at 193.

Plaintiff had an MRI of his left shoulder on July 6, 2001, which indicated a slight increase in signal at the distal portion of the supraspinatus tendon, possibly representing mild tendinitis. R at 175. Discography was recommended to rule out annular tears in the lumbar sine. R at 195.

In early October of 2001, Plaintiff reported that he had had constant pain since the accident, rated his pain as a 9 on a scale of 10. R at 164. Plaintiff had an MRI performed of the left shoulder, as well as the lumbosacral spine at the Thorek Hospital and Medical Center. Plaintiff's primary diagnosis was a rotator cuff tear in his left shoulder, and his secondary diagnosis was a neck sprain. R at 162. Because Plaintiff was unresponisve to conservative pain management over a period of approximately 8 months, his physician recommended a left shoulder arthroscopy. After being fully informed of the risks and extensive rehabilitation involved, Plaintiff agreed to undergo the procedure. R at 164-65.

On October 17, 2001, Plaintiff underwent surgery to repair a torn rotator cuff at Thorek Hospital and Medical Center. Plaintiff's post-operative diagnosis included: left shoulder partial glenoid labral tear, impingement syndrome, rotator cuff tear, synovitis and bursitis.

On November 26, 2001, Dr. Odisho stated that Plaintiff reported his shoulder pain as rating an eight on a scale of ten, and indicated that the pain increased with movement and lifting. Plaintiff also complained of low back and neck pain, which also increased with movement. R at 173. Cervical and lumbar paraspinal tenderness were noted, with subluxation at C2-3, T1-2, and L1-2. Left shoulder pain was present at 100 degrees flexion and abduction. *Id.*

In January of 2002, Dr. Odisho noted that Plaintiff's MRI of the LS spine was inconclusive, and recommended proceeding with discography of the LS spine in addition to an EMG/NCVS. R at 185. Dr. Odisho also noted that Plaintiff had been given a prescription for Tylenol 3 as well as a disability note for four weeks. He stated that Plaintiff's left shoulder was progressing very nicely and that he was able to abduct to 90 degrees and flex to 110 degrees. *Id.* That same month, Plaintiff indicated on a pain questionnaire that pain killers gave him very little relief from pain; that he performed self-care activities slowly and carefully; that pain prevented him from lifting heavy objects or from sitting for more than one hour or standing more than thirty minutes; that pain was affecting his sleep; and that he was walking with the assistance of a cane or crutches. R at 186.

In February of 2002, Plaintiff was reporting his pain as a six out of a possible ten. Dr. Odisho opined that Plaintiff had

9

reached maximum medical improvement with regard to his shoulder, and that he could return to work without restrictions. R at 184. However, Dr. Odisho also noted that Plaintiff was seeing another physician for a lumbosacral problem with a radiculopathy.   Dr. Odisho indicated that Plaintiff had been told that he required "discography of his LS [lumbosacral] spine . . . However, [he] does not want to proceed with that at this particular time." Id.

There is a large gap in the medical evidence after this time.   With the exception of sporadic visits to the emergency room for a variety of unrelated conditions, R at 226-32, 279-82, 287-93, the Record does not contain any noteworthy medical evidence until October of 2005- months after Plaintiff had filed his applications for DIB and SSI.

On October 1, 2005, Plaintiff underwent a consultative examination arranged by the Social Security Administration, and conducted by Dr. Scott Kale.  R at 213-16.  During the examination, Plaintiff complained of daily headaches, neck pain, and low back pain, with sciatica to the right low extremity.  He indicated that the surgery on his left shoulder had reduced the pain, but decreased the range of motion and strength.  R at 213-216.   Dr. Kale concluded that Plaintiff had reduced lumbar spine range of motion to 70/90 degrees flexion and 20/30 degrees extension.   The left shoulder was limited to 110/180 degrees elevation and Plaintiff could squat to only 50% of normal.  Dr.

10

Kale's clinical impressions were low back pain, neck strain, status post left shoulder repair for bursitis and obesity[6]  *Id.* Dr. Kale further noted that Plaintiff displayed normal grip strength, showed no neurological deficits, and ambulated without difficulty.  R at 215.

State agency physician Dr. Larry Von Behren reviewed Plaintiff's medical records in October of 2005.  Dr. Von Behren concluded that Plaintiff could perform a wide range of medium exertional work that did not involve ladder, rope or scaffold climbing, and which required only occasional reaching above the shoulder with the left arm.  R at 217-24.

On January 5, 2006, Dr. Peter Rosales performed a Psychiatric Evaluation for the Bureau of Disability Determination Services. R at 234.  Plaintiff reported difficulty sleeping, with interrupted sleep patterns, and depression on a scale of seven out of ten.  He also indicated low energy levels, low motivation, anhedonia, feelings of helplessness and low self worth. Plaintiff was mildly dysthymic, with mild to moderate anxiety. Plaintiff's immediate memory was in tact, but he was unable to recall three out of three objects after five minutes.  R at 236. Plaintiff was able to recall the date but he did not know how many weeks were in one year, and did not know how many nickels were in $1.15.  He was unable to do serial 7's.  He was able to

---

[6] The Record indicates that Plaintiff's BMI was 40, well within the range of obesity.

do calculations, but did not know what the terms "multiplication" and "addition" meant, and he could not spell "world" backward. Dr. Rosales opined that Plaintiff met the criteria for depression and that his depression likely initiated after his bus accident. Doctor Rosales indicated a Global Assessment of Functioning of 45, which denotes serious symptoms, or any serious impairment in social occupational or school functions. R at 238. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000).

In February of 2006, Dr. Carl Hermsmeyer reviewed plaintiff's medical records on behalf of the state agency. R at 241-54/ Dr. Hermsmeyer concluded that Plaintiff had a mood disorder that appeared secondary to his general medical condition. R at 244, 253. Dr. Hermsmeyer opined that Plaintiff's mood disorder posed only mild limitations in his ability to perform the activities of daily living, to maintain social functioning, and maintain persistence, pace, and concentration.

On July 12, 2006, Plaintiff sought treatment at Turning Point Behavioral Health Care Center in an effort to address his pain and depression. R 265-277. He reported difficulty sleeping, suicidal thoughts, and taking Tylenol for pain, which did not help. The examiner noted that Plaintiff "seems to have a limited understanding of therapy and is here on his lawyer's

recommendation." Plaintiff was diagnosed with post-traumatic stress disorder and recurrent major depression. R at 259. His Global Assessment of Functioning ranged from 45 to 51, *id.,* and he was prescribed Zoloft.

**The ALJ's Decision**

The ALJ determined that Plaintiff had not been under a disability from June 21, 2001 until the present. The ALJ acknowledged that Plaintiff suffered from the following severe impairments: lower back pain, left shoulder pain, depression, and obesity. The ALJ further found that Plaintiff suffers from only moderate difficulty in maintaining concentration, persistence, or pace, and that he has only moderate limitations in maintaining social functioning. In addition, the ALJ found that the Plaintiff had only minimal restrictions on the activities of daily living. However, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listed impairments.

In assessing Plaintiff's residual functional capacity ("RFC"), the ALJ determined that Plaintiff retained the capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for a total of about 6 hours in an 8-hour workday; sit for a total of 6 hours in an 8 hour workday; stoop, crawl, crouch and climb stairs/ramps occasionally; perform work that does not require climbing ladders/ropes/scaffolds; reach overhead with the

left upper extremity occasionally; understand, remember, and carry out simple, routine work instructions; and perform work that does not require regular general public contact. The ALJ acknowledged that Plaintiff could not perform his past relevant work, but, based upon the VE's testimony, found that there were a significant number of jobs in the local economy which Plaintiff could perform.

## STANDARD OF REVIEW

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

14

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for DBI or SSI must prove that he or she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his or her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden

15

of proof; at step five, the burden shifts to the Commissioner.
*Id.*

## DISCUSSION

### I. Evidence Regarding Plaintiff's Mental Impairment

In her decision denying benefits, the ALJ discussed the
psychiatric consultative evaluation performed by Dr. Peter
Rosales on January 5, 2006. The ALJ properly noted that Dr.
Rosales had diagnosed a mood disorder secondary to general
medical condition, and had rated Plaintiff's GAF at 45,
indicating serious symptoms or a serious impairment in social,
occupational or school functioning. R at 39. The decision goes
on to state that "[t]he psychiatrist notably opined that the
claimant did not meet the criteria for a major depressive
disorder. On mental status exam, Dr. Rosales noted mild to
moderate anxiety but the exam was otherwise essentially within
normal limits. " R at 39.

To the contrary, Dr. Rosales' report does not conclude that
Plaintiff does *not* have a major depressive disorder. Dr. Rosales
report does, however, state that Plaintiff's symptoms "do meet
the criteria for depression. His symptoms include a subjective
depression, low energy levels, low motivation, anhedonia,
feelings of helplessness, feelings of low self-worth, as well as
insomnia." R at 237-38. In addition, Dr. Rosales made a number
of findings that were not "otherwise essentially within normal

16

limits." R at 39. Dr. Rosales noted that Plaintiff was mildly dysthymic and unable to recall three of three objects after five minutes, R at 236, that Plaintiff did not know the number of weeks in a year or how many nickels there were in $1.15, and he was unable to perform serial 7s. R at 237.

When an ALJ mischaracterizes evidence supporting Plaintiff's claim, the Court cannot conclude that the ALJ's decision is supported by substantial evidence. *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002)(questioning how a medical report "documenting a neurophysiological disturbance, however 'slight', could be categorized as 'unremarkable.'") Moreover, the ALJ is not free to rely upon those portions of Dr. Rosales' report that support her conclusions, while disregarding evidence favorable to Plaintiff's claim. *Binion v. Chater,* 108 F.3d 780, 788-89 (7th Cir. 1997) (remanding where an ALJ "seemed to pick and choose among the pieces of evidence.") The Court finds that the ALJ's mischaracterization of and selective citation to Dr. Rosales' report requires the Court to remand this case back to the Commissioner.

Plaintiff then argues that the ALJ also improperly relied upon Dr. Kale's statement from his internal medicine consultative examination that Plaintiff suffered from no mental abnormalities. Notably, Dr. Kale is not a mental health professional, and his opinion directly contradicts both Dr. Rosales' opinion and the

17

opinion of the physicians at Turning Point regarding Plaintiff's
mental condition. The Seventh Circuit has questioned the
appropriateness of an ALJ relying upon a non-mental health
professional's assessment of a mental impairment, particularly
when a mental health professional offers a contradictory opinion.
*Wilder v. Chater,* 64 F.3d 335, 337 (7th Cir. 1995). However, a
review of the ALJ's decision fails to support Plaintiff's claim
that the ALJ improperly relied upon Dr. Kale's findings. The ALJ
discussed Dr. Kale's report only in terms of Plaintiff's physical
impairments. R at 39. As such, Plaintiff's argument on this
point is misguided.

Next, Plaintiff labels the ALJ's decision as untrustworthy,
because of the inconsistency between the ALJ's RFC finding and
the hypotheticals posed to the VE. While the ALJ concluded that
Plaintiff was moderately limited in maintaining concentration,
persistence, or pace, Plaintiff claims that she made no attempt
to reflect these limitations in posing hypotheticals to the VE.
To the contrary, as the Commissioner correctly notes, the ALJ's
hypothetical accommodated this moderate limitation by limiting
Plaintiff to simple and routine jobs that did not require regular
contact with the public. Once again, Plaintiff's argument misses
the mark.

## II. The ALJ's Credibility Determination.

Plaintiff takes issue with the ALJ's determination that his testimony was not entirely credible. Plaintiff first argues that the ALJ erred, because she did not identify which testimony she found to be incredible, as required by SSR 96-7. Pl's Brf. at p 8. To the contrary, the ALJ's decision specifically provides that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." R at 39. Neither the cases cited by Plaintiff, *Golembiewski v. Barnhart,* 322 F.3d 912, 916 (7th Cir. 2003), and *Steele*, 290 F.3d at 942, nor the Regulations require the ALJ to be any more specific in identifying questionable testimony.

Plaintiff next challenges the reasonableness of the ALJ's explanation for labeling his testimony incredible. Plaintiff notes that the ALJ relied upon his failure to seek medical treatment and the substantial gap in his medical records in evaluating Plaintiff's credibility. This was inappropriate, Plaintiff argues, because the ALJ failed to address Plaintiff's explanation for not seeking treatment. Specifically, Plaintiff testified at the hearing that he did not seek additional medical treatment after his shoulder surgery and therapy in 2002, because: 1)his physical therapist told Plaintiff there was

19

nothing more that could be done to alleviate his shoulder pain; 2) while back surgery was recommended to address his back pain, Plaintiff was frightened about undergoing another surgery, particularly since he was disappointed by the outcome of his shoulder surgery; 3) the pain medication Plaintiff was prescribed did little to relieve his pain; and 4) he was uninsured, unable to drive himself to Cook County Hospital, and did not have access to other transportation or medical care.

As evidence supporting the ALJ's credibility determination, the Commissioner highlights the inconsistency between Plaintiff's claim that transportation woes prevented him from seeking additional treatment for his purportedly disabling pain, and Plaintiff's ability to obtain emergency medical care for what appear to be far less compelling ailments, such as concerns about skin tags and boils. Even more damaging, the Commissioner argues, is the fact that Plaintiff never sought treatment for his back and shoulder pain during those hospital visits, which occurred between 2002 and 2005. The Court acknowledges that these inconsistencies might well have informed the ALJ's credibility determination, but there is simply no way of knowing if that is the case. The ALJ's decision makes no reference to these factors in discussing Plaintiff's credibility. Caselaw is clear that the Commissioner is not permitted to rely upon grounds for questioning credibility that were not advanced by the ALJ.

*See Golembiewski,* 322 F.3d at 916 ("general principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.") Moreover, lack of access to medical care is but one of the many reasons advanced by Plaintiff in explaining the large treatment gap.

Next, the Commissioner argues that the ALJ properly considered Plaintiff's explanation regarding his lack of medical treatment for shoulder and back pain in 2002 through 2005, because, at the hearing, the ALJ thoroughly questioned Plaintiff about the large gap in his medical care. Despite the ALJ's thorough questioning of Plaintiff's sparse medical records at the hearing, the ALJ's discussion of the matter in her decision denying benefits is not nearly as extensive. In her decision, the ALJ merely referenced Plaintiff's intermittent treatment in concluding that Plaintiff has "not generally received the type of medical treatment one would expect for a totally disabled individual." R at 39. The ALJ made no effort to address Plaintiff's explanation for his lack of medical treatment.

The question then becomes whether the ALJ is required to explain why she rejected Plaintiff's reasons for not seeking medical treatment for purportedly disabling conditions. Social Security Regulation 96-7p[7] provides that "the adjudicator must

---

[7] The Court acknowledges that a lack of medical treatment is one permissible factor that may be considered in evaluating a

not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."

Many Circuits, including the Seventh Circuit, have questioned the relevance of a claimant's failure to seek medical treatment, especially when he or she is unable to afford it. *See, e.g., Herron v. Shalala,* 19 F.3d 329, 336, n. 11 (7th Cir. 1994) ("Lack of discipline, character or fortitude in seeking medical treatment is not a defense to a claim for disability benefits."); *See also, Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) (ruling that the ALJ erred by discrediting the plaintiff's complaints of disabling pain where the record was consistent with the plaintiff's claim that financial strain prevented her from

claimant's credibility regarding subjective pain. *Cates v. Barnhart,* 2007 WL: 968751, at *8 (S.D. Ind. Mar. 12, 2007). However, the ALJ must consider the entire case record to determine whether the individual's statements are credible. Relevant factors the ALJ must consider are the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; other treatment or measures taken for relief of pain; and any other factors concerning the individual's functional limitations and restrictions. 20 C.F.R. § 404.1529©. *See also Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir.2001).

seeking medical treatment.)  In deciding whether a plaintiff's
failure to pursue treatment contradicts his claims of disabling
pain, the Tenth Circuit identified four factors that an ALJ
should evaluate:  1)whether treatment would enable the plaintiff
to return to work; 2) whether the treatment was prescribed; 3)
whether the treatment was refused; and, if so 4) whether the
refusal was justifiable.  *Thompson v. Sullivan,* 987 F.2d 1482
1490 (10th Cir. 1993)[8].

There is no indication from the ALJ's decision that she
considered any of these factors in determining that Plaintiff's
failure to pursue treatment rendered his claims of disabling pain
incredible.  Nor does the ALJ offer any explanation for rejecting
the explanation advanced by Plaintiff[9].  While the Court is
loathe to reject an ALJ's credibility finding unless it is
patently wrong, *Collins v. Barnhart,* 2008 WL 313769, at *10 (N.D.
Ill. Feb. 4, 2008), the Court cannot excuse the ALJ from her duty
to comply with the Social Security Regulations.  *Brindisi v.
Barnhart,* 315 F.3d 783, 787(7th Cir. 2003).  Caselaw makes clear
that, while a plaintiff's lack of medical treatment may undermine
the credibility of a claim that pain is disabling, it is equally

---

[8] The Seventh Circuit cited these factors with apparent
approval in *Herron,*19 F.3d at 336, n. 11.
[9] The Court could not permit the ALJ to state that she
rejected Plaintiff's explanation regarding lack of medical care
as incredible, because she had already determined that his lack
of medical care rendered him incredible- such logic would be far
too circular to be persuasive.

clear that the disabled claimant may have a valid basis for
nevertheless deciding not to pursue treatment. *Lawson v.
Barnhart,* 455 F. Supp.3d 747 (N.D. Ill. 2006) (finding that the
ALJ erred in concluding that the claimant's lack of medical
treatment rendered his claims incredible, where the claimant
explained that additional treatments would not have alleviated
his condition.) As such, the Court concludes that the ALJ erred
in failing to explain why she rejected Plaintiff's explanations
regarding the gap in medical treatment between 2002 and 2005.

Finally, the ALJ's decision notes that while Plaintiff told
most medical providers that his impairments largely were the
result of a bus accident, he told the psychiatric consultant in
January of 2006 that his shoulder pain resulted from work as a
hose fitter. R at 38. Plaintiff notes that there is no evidence
in the Record that he was ever a "hose fitter", and chalks up the
inconsistency to error on the part of the consultative examiner.
In any event, Plaintiff argues, the ALJ had a duty to resolve the
inconsistency by examining the Record- which would have shown
that Plaintiff never worked as a hose fitter- or by questioning
Plaintiff in an effort to resolve the inconsistency. SSR-96-7p
("the lack of consistency between an individual's statements . .
does not necessarily mean that the individual's statements are
not credible . . . the adjudicator will need to review the case
record to determine whether there are any explanations for any

variations in the individual's statements.") It is apparent that the ALJ did neither. As such, the Court agrees that it is unreasonable to draw a negative inference from the inconsistency.

## III. The ALJ Failed to Adequately Address the Combination of Plaintiff's Impairments

Plaintiff next argues that the ALJ's decision failed to account for his headaches(R at 154, 213, 238, 257, 335), vision disturbances[10], dizziness, sleep disturbance, pain, hand numbness, fatigue, post-traumatic stress disorder, and obesity in forming his RFC. The Commissioner addresses the issue only with regard to Plaintiff's obesity, noting that Plaintiff failed to identify any additional work related limitations that resulted from his obesity. *Skarbek v. Barnhart,* 390 F.3d 500, 504 (7th Cir. 2004) ("Notably, Skarbek does not specify how his obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk.")

While the Court agrees that Plaintiff has failed to identify the additional limitations that would arise from his obesity, the Commissioner cannot escape the fact that the ALJ's decision

---

[10]Plaintiff's citations to the medical records do not indicate that Plaintiff suffers from vision disturbances- the only mention of this condition can be found, briefly, in Plaintiff's testimony at the hearing. R at 335. Moreover, on July 21, 2006, Plaintiff reported to Turning Point that his visual functioning was "normal". R at 257. In addition, Plaintiff cites to this same report from Turning Point, R at 257, in support of his claim that he suffered from dizziness, but a review of this portion of the Record makes no mention of dizziness.

25

makes no mention whatsoever of Plaintiff's headaches, sleep
disturbance, pain, hand numbness, and fatigue. *Herron,* 19 F.3d at
334 ("even where objective medical evidence is sparse, the ALJ
still has the duty to consider the evidence and explain [her]
conclusions.") Admittedly, the medical evidence regarding these
conditions is light. However, the Commissioner does not
challenge the validity of the evidence documenting these
conditions. "Once the presence of a medically determinable
physical or mental impairment is established that could
reasonably be expected to produce the pain alleged, but the
intensity or persistence of the pain is unsubstantiated by the
medical record, the ALJ is obliged to examine and weigh all the
evidence including observations by treating and examining
physicians, third-party testimony, the claimant's testimony and
daily activities, functional restrictions, pain medication taken,
and aggravating or precipitating factors to evaluate how much the
claimant's impairment affects his ability to work." *Id.*

Upon remand, the Court directs the ALJ to address all of
Plaintiff's medically determinable impairments.

**IV. The ALJ Did Not Fail to Adequately Develop the Record**

In his opening brief, Plaintiff takes issue with the ALJ's
refusal to keep open the Record for additional medical records
regarding Plaintiff's recent accident. As the Commissioner
correctly points out, however, Plaintiff bears the burden of

demonstrating how he was prejudiced by the ALJ's decision. Notably, Plaintiff does not allege that the accident had any impact on his ability to perform work related activities. "Mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Binion v. Shalala,* 13, F.3d 243, 246 (7th Cir. 1994). Plaintiff has made no attempt to carry his burden of demonstrating prejudice, and, in fact, abandoned the argument in his reply brief. As such, the Court rejects Plaintiff's argument.

## CONCLUSION

For the reasons set forth above, the Court DENIES the Commissioner's Motion for Summary Judgment, and GRANTS Plaintiff's Motion for Summary Judgment, in part, remanding the matter back to the Commissioner for further action consistent with this Opinion.

Dated: February 25, 2008    E N T E R:


ARLANDER KEYS
United States Magistrate Judge

27